IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

        v.

AMANDA J. GLORIA,

                Defendant.

_____

22-CR-38-WMS

## INFORMATION

### The United States of America Charges That:

### GENERAL ALLEGATIONS

1.     At all times relevant to this Information:

     a.     Defendant AMANDA J. GLORIA ("GLORIA") was a resident of Altus, Oklahoma. GLORIA owned and controlled WildWest Trucking LLC ("WildWest Trucking"), an Oklahoma-based business.

     b.     ADAM D. ARENA ("Arena") was a resident of Great Valley, New York. Arena owned and controlled ADA Auto Group LLC ("ADA Auto Group"), a Florida-based business.

     c.     Bank-1 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Minnesota.

     d.     Bank-2 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Georgia.

     e.     Bank-3 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Idaho.

        f.      Bank-4 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in New Jersey.

        g.      Bank-5 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Massachusetts.

        h.      Bank-6 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in California.

        i.      Bank-7 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in New Jersey.

        j.      Bank-8 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Utah.

        k.      Bank-9 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Oklahoma.

        l.      Bank-10 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in New Jersey.

        m.      Bank-11 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Delaware.

n.      Bank-12 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, and a PPP participating lender with a branch in Pennsylvania.

o.      Bank-13 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, with a branch in Florida where ADA Auto Group held a business account.

p.      Bank-14 was a financial institution as that term is defined under 18 U.S.C. § 20 and 31 U.S.C. § 5312, with a branch in Oklahoma where WildWest Trucking held a business account.

### Paycheck Protection Program ("PPP")

q.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 designed to provide emergency financial assistance to millions of Americans suffering economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or about April 2020, Congress authorized over $300 billion in additional PPP funding.

r.      To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which had to be signed by an authorized representative of the business. The loan application required the business—through its authorized representative—to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the loan application, the small business was required to state, among

other things, its average monthly payroll expenses and number of employees.  These figures were used to calculate the amount of money the business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

    s.  A PPP loan application had to be processed by a participating lender. If a loan application was approved, the participating lender funded the loan using its own money, which was 100% guaranteed by the U.S. Small Business Administration (the "SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

    t.  PPP loan proceeds had to be used by the business on certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business used the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

    u.  To qualify for a PPP loan, every application was required to certify that the business seeking the loan "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."

4

## COUNT 1

### (Conspiracy to Commit Bank Fraud)

### The United States of America Further Charges That:

2.     Paragraph 1 of this Information is realleged and incorporated by reference as though fully set forth here.

3.     From at least in or about May 2020 through at least in or about June 2021, in the Western District of New York and elsewhere, the defendant, **AMANDA J. GLORIA**, did knowingly and willfully combine, conspire, and agree with ADAM D. ARENA and others, known and unknown to the United States of America, to commit bank fraud, in violation of Title 18, United States Code, Section 1344, that is, to knowingly and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud 12 financial institutions, namely, Bank-1 through Bank-12, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of the respective financial institutions, by means of materially false and fraudulent pretenses, representations, and promises.

### Object of the Conspiracy

4.     The object of the conspiracy was for GLORIA and Arena, along with others, known and unknown to the United States of America, to enrich themselves by fraudulently obtaining federal COVID-19 emergency relief funds from Bank-1 through Bank-12 by submitting fraudulent loan applications.

5

**Manner and Means of the Conspiracy**

5.      The manner and means by which GLORIA and Arena, along with others, known and unknown to the United States of America, effected and attempted to effect the object of the conspiracy, included the following, among others:

a.      In or about May 2020, from within the Western District of New York, Arena reinstated his previously inactive business, ADA Auto Group, which had been inactive since in or about 2018. Similarly, in or about May 2020, GLORIA reinstated her previously inactive business, WildWest Trucking, which had been inactive since in or about 2017.

b.      On or about July 27, 2020, GLORIA submitted a PPP loan application to Bank-1 seeking an approximately $954,000 PPP loan for ADA Auto Group (the "ADA Application"). Among other contact information, the Application named Arena as the contact name, and listed "arenaadam@yahoo.com" as the contact email address. Among other supporting documentation, the Application included four materially false and fraudulent documents purporting to be ADA Auto Group's 2019 quarterly Form 941 filings, and a materially false and fraudulent document purporting to be ADA Auto Group's 2019 Form 940 filing. Among other certifications, the ADA Application falsely and fraudulently certified that ADA Auto Group had been in operation on February 15, 2020, and further certified that the loan would be used for business-related purposes, and that if it were used for "unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

c.      On or about August 6, 2020, GLORIA supplemented the ADA Application by knowingly submitting five documents purporting to be ADA Auto Group's

6

payroll reports to Bank-1. Again, all of these documents were materially false and fraudulent because Arena's company was not operating in the fourth quarter of 2019 or the first quarter of 2020, and was not reinstated until in or about May 2020.

d.      The tax forms and payroll reports knowingly submitted by GLORIA on behalf of ADA Auto Group were also materially false and fraudulent because these documents claimed that ADA Auto Group employed 50 people in 2019 with an annual payroll of more than $4.4 million, which GLORIA knew to be false, since ADA Auto Group was not operating in 2019, and was not reinstated until in or about May 2020.

e.      On or about August 10, 2020, from within the Western District of New York, Arena emailed Bank-1 and provided wire instructions for ADA Auto Group's business account at Bank-13, where Arena directed Bank-1 send the PPP loan proceeds.

f.      On or about August 13, 2020, from within the Western District of New York, Arena electronically signed and submitted the closing loan documents to Bank-1 using the instructed third-party electronic platform. These documents contained a materially false certification that the PPP loan proceeds would be used for specified business-related purposes.

g.      On or about June 29, 2020, a PPP loan application was submitted on GLORIA's behalf to Bank-1 seeking an approximately $421,000 PPP loan for WildWest Trucking (the "WildWest Application"), an entity owned and incorporated by GLORIA. GLORIA personally aided and assisted in the preparation of the WildWest Application, which was submitted with various supporting documents, including what purported to be a true copy of an IRS "Form 940" filing for tax year 2019. The Form 940 filing claimed that WildWest Trucking had paid approximately $1.9 million in wages to its employees during

the 2019 tax year. This Form 940 was false, however, since WildWest Trucking was inactive from 2017 through 2019. GLORIA knew the WildWest Application contained false and fraudulent information, knew that it was submitted to Bank-1 on her behalf, and intended to use the proceeds to enrich herself personally.

        h.      On or about July 31, 2020, the WildWest Application was approved, and Bank-1 loaned WildWest Trucking approximately $421,000. Bank-1 deposited the loan proceeds into WildWest Trucking's business account at Bank-14, an account which was exclusively controlled by GLORIA.

        i.      Between in or about May 2020 through approximately June 2021, the defendant, **AMANDA J. GLORIA**, submitted, and worked with others to submit, 153 fraudulent PPP loan applications to Bank-1 through Bank-12 on behalf of 111 entities, including ADA Auto Group and WildWest Trucking. On these loan applications, which sought a total of approximately $43.8 million in PPP funds, GLORIA falsified or aided and assisted in falsifying various information, including the number of employees, payroll expenses and documentation, and federal tax filings. Thereafter, GLORIA submitted, or aided and assisted in the submission of, the applications to a financial institution. Based on the false and fraudulent representations contained application materials prepared or submitted by GLORIA, the recipient entities fraudulently obtained approximately $32.5 million in PPP funds from Bank-1 through Bank-12. From those funds, GLORIA personally received at least approximately $1.7 million.

      **In violation of Title 18, United States Code, Section 1349.**

## COUNT 2

**(Engaging in Monetary Transactions with Criminally Derived Proceeds)**

**The United States of America Further Charges That:**

6.      Paragraphs 1   and   4 through 5 of this Information are realleged and incorporated by reference as though fully set forth here.

7.      On or about August 14, 2020, in reliance on the false certification that it received from Arena, among other things, Bank-1 transferred approximately $954,000 in PPP loan proceeds to ADA Auto Group's business account at Bank-13.

8.      After the approximately $954,000 in PPP loan proceeds were transferred to this account, GLORIA directed Arena to conduct at least one financial transaction of a value greater than $10,000 from within the Western District of New York.

9.      More specifically, on or about September 22, 2020, in the Western District of New York and elsewhere, the defendant, **AMANDA J. GLORIA**, knowingly engaged and attempted to engage in a monetary transaction, affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and aided and abetted the same, to wit, by transferring approximately $24,135 from Bank-13 via check to the bank account of WildWest Trucking, at Bank-14, such property having been derived from a specified unlawful activity, namely, bank fraud, in violation of Title 18, United States Code, Section 1344.

**In violation of Title 18, United States Code, Sections 1957 and 2.**

9

## FORFEITURE ALLEGATION

### The United States of America Alleges That:

Upon conviction of any of the offenses alleged in Counts 1 and 2 of this Information, the defendant shall forfeit to the United States any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of said violations and any and all property used, and intended to be used, in any manner or part, to commit or to facilitate the commission of said violations, including, but not limited to the following:

**MONETARY JUDGMENT:**

The sum of Thirty-two Million Four Hundred Ninety-Seven Thousand One Hundred Ninety-Seven Dollars and Fifty-Eight Cents ($32,497,197.58) in United States Currency, to be evidenced by a monetary judgment issued by this Court in aforesaid amount.  Said judgment amount will accrue at the prevailing rate per annum and serve as a judgment and lien against defendant's property, wherever situated until fully satisfied; and

## SUBSTITUTE ASSETS

If any of the property described above as being subject to forfeiture, as a result of any

act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;
(2) has been transferred or sold to, or deposited with, a third person;
(3) has been placed beyond the jurisdiction of the Court;
(4) has been substantially diminished in value; or
(5) has been commingled with other property which cannot be divided without difficulty;

It is the intention of the United States, pursuant to Title 21, United States Code,

Section 853(p), to seek forfeiture of any other property of said defendant up to the value of

the above forfeitable property.

**All pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States**

**Code Section 853(p), and Title 28, United States Code, Section 2461(c).**


DATED:  Buffalo, New York, April 6, 2022.


TRINI E. ROSS
United States Attorney
Western District of New York



BY: _____
LAURA A. HIGGINS
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202
716-843-5862
Laura.Higgins@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice



BY: _____
CORY E. JACOBS
Assistant Chief
JENNIFER L. BILINKAS
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
202-616-4994
Cory.Jacobs@usdoj.gov

11